# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

ANHEUSER-BUSCH, INC.,      )
                                 )
        Plaintiff,          )
                                 )
      vs.                 )     **Case No. 4:08cv0358 TCM**
                                 )
VIP PRODUCTS, LLC,         )
                                 )
        Defendant.       )

## MEMORANDUM AND ORDER

This is an action[1] filed by Anheuser-Busch, Incorporated ("Plaintiff") against VIP Products, LLC, ("VIP"), for trademark infringement, unfair competition, and dilution. Pending is Plaintiff's motion for a preliminary injunction, see Fed.R.Civ.P. 65, to bar VIP from manufacturing, distributing, marketing, and selling a dog squeeze toy called "Buttwiper." The Court heard testimony from four witnesses[2] and received evidence on the motion on August 27, 2008, and now finds and concludes as follows.

## Findings of Fact

Plaintiff is a leading American brewer. Plaintiff's beers are brewed in twelve breweries in the United States alone and sold to exclusive wholesalers who then sell to retailers and other accounts. Although "Budweiser" is not its top-selling beer, it is Plaintiff's flagship brand; its label is treated with "reverence" by Plaintiff and its employees. The label is also a

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

[2] Plaintiff called George Mantis; Thomas Shipley, Jr.; and Thomas Prindiville. VIP called Stephen Sacra.

registered trademark. Plaintiff has used the "Budweiser" word mark, also a registered trademark, and the "Budweiser" label design in the United States since 1876. The "Budweiser" bottle is used in much of Plaintiff's advertising. "Budweiser" is sold to 829 chain retailers across the country. (Pl. Ex. 32.) From 2000 to 2007, Plaintiff sold approximately three billion dollars of "Budweiser" to its wholesalers. (Pl. Ex. 33.) In 2008, Plaintiff spent approximately 156 million dollars in advertising in the United States on "Budweiser" alone. (Pl. Ex. 35.) Special emphasis is placed in advertising to 21 to 28 year old consumers.

Along with beer products, Plaintiff sells various non-beer items. (Pl. Exs. 40-47). These items range in character from door hangers to shirts to dog leashes and collars to beach chairs. (Id.) Each has "Budweiser" printed on it in some form. (Id.) Some of these items, including a dog bed, have a replica of the "Budweiser" label. (Id.) Other pet products are sold by Plaintiff, including food/water bowls, frisbees, balls, leashes, collars, and pet mats. (Pl. Exs. 40-47, 49-50.) Plaintiff has received $147,500 in sales of dog items from 1980 to date. (Pl. Ex. 48.) Plaintiff does not sell or license any type of dog squeeze toy.

The main purpose of the sale of non-beer items is to place Plaintiff's trademark into consumers' hands, but not at the cost of the brand image. These branded items are sold in retail stores, grocery stores, convenience stores, and on-line. Between 2000 and 2007, revenue of 400 million dollars was received by Plaintiff from the sale of these items in the United States. (Pl. Ex. 37.) This figure does not including licensing revenue. (Id.)

Plaintiff is careful and cautious in selecting licensees with which to place its trademarks. Plaintiff's licensing agreement requires that if its licensees learn of any infringement or of the "existence, use or promotion of any mark or design similar" to Plaintiff's

licensed properties, the licensees are to report such. (Pl. Ex. 38, § 11.) Additionally, Plaintiff's employees are vigilant in advising its legal department when any possible infringement of Plaintiff's brands are discovered. Plaintiff believes that if it permits an unauthorized use of its properties, the value of those properties and licensing agreements is decreased. Also, the value of its properties would be diluted if Plaintiff's marks are placed on inferior or improper items and quality stores would be less likely to market Plaintiff's branded items.

George Mantis is the president and founder of the Mantis Group, a survey research firm that designs surveys, analyzes the results and reports its findings.[3] Mr. Mantis designed and conducted a survey to determine whether VIP's product, "Buttwiper," is likely to cause confusion with Plaintiff's product, "Budweiser." (Pl. Ex. 21.) Interviews for the survey were conducted from April 16 to May 8, 2008; 327 individuals were interviewed. These individuals were volunteers found in nine shopping malls, one in each United States census division, i.e., New Jersey, Connecticut, Michigan, Illinois, Tennessee, Florida, Texas, California, and Colorado, that represent all four United States census regions, i.e., the East, Midwest, South, and West. (Pl. Ex. 26.) The individuals were 21 years of age or older,[4] were likely to purchase a dog toy within the next six months, and were not employed by an entity

---

[3]VIP stipulated that Mr. Mantis is an expert in the field of survey research. (Pl. Ex. 19.)

[4]Due to Plaintiff's sensitivity to not interviewing individuals who are not of legal drinking age, those under the age of 21 were excluded from the survey. Mr. Mantis testified, without contradiction, that excluding those individuals who were 18, 19, or 20 years old had no real affect on the survey results because of the small portion of the adult population they represented (approximately 6%).

that profited from the sale of pet products.  (Pl. Ex. 21 at 2.)  Mr. Mantis testified that when

creating the survey he relied on seven factors cited in the <u>Manual of Complex Litigation</u> and

procedures described in the Federal Judicial Center Reference Guide on survey research.  (Tr.

at 23-24.)  Those factors include (1) properly choosing the survey universe, i.e., which

individuals to include; (2) obtaining a representative sample of that universe; (3) making

certain that the interviewers are qualified; (4) making certain that the interviewers follow

prescribed procedures; (5) making the questions in the survey clear, relevant, and non-leading;

(6) making certain that the analysis plan comports with accepted statistical principles and is

relevant; and (7) making certain that the entire survey process is objective.  (Tr. at 24-25.)

Professional interviewing agencies conducted the questioning of individuals with the

survey designed by Mr. Mantis.  After a person was found to be qualified for the survey, he

or she was escorted into an interview room.  An interviewing specialist instructed each

interviewer and sat in on his or her first several interviews to make certain the proper

procedures were followed. (Pl. Ex. 24.) The process was a "double-blind survey," i.e., neither

the interviewer nor the interviewee knew the purpose of the survey.  The interviewees were

instructed not to guess and that "I don't know" was an acceptable answer.  The interviewee

was shown either the test product (Pl. Ex. 28) or a control product[5] (Pl. Ex. 29) and allowed

---

[5]The control product is used in confusion surveys to make certain that any confusion between the products at issue is not caused by an unrelated factor.  In this case, the focus was on any confusion between "Buttwiper" and "Budweiser" and whether that confusion was caused by something unrelated to the "Budweiser" mark or trade dress.  Therefore, to be effective the control product could not share any characteristics with the test product that was being tested.  (Tr. at 37.) In the instant case, the control product had a different color scheme than the test product, the name was changed to something that did not have a similar sound, and the label design was modified.  (Tr. at 37-38; Pl. Ex. 29.)  An analogy described by Mr. Mantis is when half the test subjects are given a placebo in a drug test and the other half are given the new drug.  (Tr. at 37.)

to view the items at their leisure.[6]  The interviews were conducted with the survey questions. (Pl. Ex. 24)  A validation question was used to re-contact the interviewees to verify that the interview had occurred.  (Pl. Ex. 27.)  All the survey responses are in Plaintiff's Exhibit 30.

Analyzing those responses according to the accepted market research principles in the survey, there was a 30.3% net confusion rate.  (Pl. Ex. 20; Pl Ex. 21 at 10.)  In other words, one of three people interviewed mistakenly believed that VIP's "Buttwiper" is manufactured and marketed by, or with the approval of, Plaintiff or that there is some affiliation between "Buttwiper" and Plaintiff.  (Pl. Ex. 21 at 11.)

Plaintiff discovered "Buttwiper" when Thomas Prindiville, Plaintiff's Group Manager of Consumer Marketing, and an associate were conducting an internet word search using the term "Budweiser Beer" on a Sears & Roebuck Company website in search for a new product – an ice chest with the "Budweiser" name attached.  Along with the "Budweiser" ice chest, search results included "Buttwiper."

Stephen M. Sacra is the owner and operator of VIP.  His company creates, manufactures, and sells high quality, durable dog toys.  VIP sells three brands of dog toys: "Tuffy," "Mighty," and "Silly Squeakers."  "Buttwiper" is with the "Silly Squeakers" brand. VIP's dog toys are high-end and cost more than most, if not all, other dog squeeze toys on the market.  "Silly Squeakers's" first squeeze toy was a two-headed object called "Mr. Poop." "Buttwiper" and "Catarama" – packaged with "Buttwiper" – were created to augment "Mr.

---

[6]The cost of an item is relevant to the time a potential purchaser views the item.  Here, although the cost ($20.00 for two pet toys) is not a major expense, the subjects were never rushed while they were observing the two products at issue.  This is an accepted survey format.

Poop."  The idea for "Buttwiper" came from a Stanley Steamer commercial in which a dog scoots across the floor while rubbing its bottom on the carpet.  The reaction of the mother to the dog's actions suggests that the carpet will now need to be cleaned.  This scooting action is depicted on the label of the "Buttwiper" squeeze toy.  Mr. Sacra directed a graphic designer to "make a knock-off of a beer bottle label" for "Budweiser"/"Buttwiper."  (Def. Ex. 53.) Specifically, he advised the designer to change the "Budweiser" label and make a knock-off of it.  (Sacra Dep. at 129.)  The first version of the "knock-off" appears in Exhibit 53; the final version is in Exhibit 55.  The second version of "Buttwiper" is closer to the "Budweiser" label than is the first.  The use of the "knock-off" of the "Budweiser" brand was not authorized by Plaintiff.  Mr. Sacra testified that the dark line to the rear of the dog on the "Buttwiper" label is not a trail of feces but is a "deep shadow."

Shipments of "Buttwiper" began on September 13, 2007.  The "Buttwiper" toy is sold in a two-pack with "Cataroma," another squeeze toy, for approximately $19.95.  The two-pack is sold in over 500 pet specialty stores, none of which are one of the 829 retailers listed on Plaintiff's Exhibit 32.  VIP sells 200 other dog toys in addition to the "Buttwiper"/"Cataroma" product.  VIP markets its products via trade shows; only 2% are sold on its website.  Eleven-thousand five-hundred "Buttwiper" products have been manufactured,[7] totaling $67,000 in gross revenue and approximately $29,000 in profit for VIP.  (Def. Ex. 60.)  Mr. Sacra testified that approximately 3500 "Buttwiper"/"Cataroma" two-packs have been sold. There are approximately 3178 remaining in inventory.

---

[7]"Buttwiper" is made in China.

It is the opinion of both Mr. Prindiville and Thomas Shipley, Jr., Plaintiff's Director of Marketing for the "Budweiser" brand, that VIP's "Buttwiper" squeeze toy creates a negative impression of the "Budweiser" brand. There is no evidence that Plaintiff has lost any sales because of "Buttwiper." Neither Mr. Prindiville nor Mr. Shipley have heard of any specific confusion by consumers caused by "Buttwiper."

Plaintiff's Exhibits 31 and 36 are photographs of a "Budweiser" beer and of "Buttwiper." The Court finds that the "Buttwiper" packaging, labeling, colors, and trade dress are similar to those of Plaintiff's "Budweiser" label and trade dress.

### Discussion

Plaintiff is seeking a preliminary injunction on its Missouri and federal trademark infringement, unfair competition, and dilution claims.[8] Factors the Court must consider when resolving Plaintiff's request are: "(1) the threat of irreparable harm to [Plaintiff]; (2) the state of the balance between this harm and the injury in granting the injunction will inflict on [VIP]; (3) the probability of [Plaintiff] succeeding on the merits; and (4) the public interest." **Phelps-Roper v. Nixon**, 509 F.3d 480, 484 (8th Cir. 2007). The Court's analysis for each claim will begin with an assessment of the likelihood of success on the merits. See **Planned Parenthood Minn. v. Rounds**, 530 F.3d 724, 732 (8th Cir. 2008) (en banc) ("If the party with the burden

---

[8]In its seven-count complaint, Plaintiff alleges federal trademark infringement, in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114 (Count I); unfair competition, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); dilution, in violation of 15 U.S.C. § 1125(c) (Count III); Missouri trademark infringement, in violation of Mo. Rev. Stat. § 417.056 (Count IV); trademark dilution, in violation of Mo. Rev. Stat. § 417.061 (Count V); trademark infringement, in violation of Arizona law, Ariz. Rev. Stat. § 44-1451, and "the laws of numerous other states" (Count VI); trademark dilution, in violation of Arizona law, Ariz. Rev. Stat. § 44-1448, and "the laws of numerous other states" (Count VII); and common law trademark infringement and dilution (Count VIII). At issue in the motion for preliminary injunction are the claims in Counts I through V.

of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh [the other three] factors."); **Shrink Mo. Government PAC v. Adams**, 151 F.3d 763, 765 (8th Cir. 1998) (describing this consideration as the most important of the four factors).

I. Trademark Infringement/Unfair Competition Claims.[9] Section 32 of the Lanham Act makes it illegal for any person, without the consent of the registrant, "to use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a). "Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), creates a federal cause of action for trade dress infringement." **Gateway, Inc. v. Companion Prods., Inc.**, 384 F.3d 503, 507 (8th Cir. 2004). "'Trade dress is the total image of a product, the overall impression created, not the individual features.'" **Id.** (quoting Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994)).

A. Likelihood of Success on the Merits. At the preliminary injunction stage of litigation, the movant must establish "a substantial likelihood of prevailing on the merits of [its] claim." **Phelps-Roper**, 509 F.3d at 485. This is a question of whether the movant "has a 'fair chance of prevailing,'" **id.** (quoting Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 690 (8th Cir. 2003)), and not whether the movant has proven "'a greater than fifty per cent likelihood [it] will prevail on the merits,'" **id.** (quoting Dataphase Sys., Inc. v. C L Sys.,

---

[9]Neither party distinguishes these two claims in their briefs. Neither will the Court.

8

_Inc._, 640 F.2d 109, 113 (8th Cir. 1981)).  The determination of whether Plaintiff has established a likelihood of success must be made in the context of its various claims.

To succeed on the merits of its infringement claim, Plaintiff must prove that its trade dress "(1) [is] inherently distinctive or [has] acquired distinctiveness through secondary meaning; (2) [is] nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product." **Gateway, Inc.**, 384 F.3d at 507 (citing Insty*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 667 (8th Cir. 1996)); accord **Children's Factory, Inc. v. Benee's Toys, Inc.**, 160 F.3d 489, 493 (8th Cir. 1998).

It is undisputed that Plaintiff has carried its burden on the first prong.  VIP has stipulated to the strength of the "Budweiser" bottle label, dress design and trademark.  See Pl. Ex. 31 (color photograph of "Budweiser" beer bottle.)  The parties have stipulated that the "Budweiser" label is distinctive and has priority to "Buttwiper."  Indeed, the "Budweiser" label has been a national and global icon since 1876.

Plaintiff has also carried its burden of satisfying the second prong.  "In order to be protected, [Plaintiff's] trade dress must be nonfunctional." **Gateway, Inc.**, 384 F.3d at 508. "[T]rade dress is nonfunctional 'if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality.'" **Id.** (quoting Prufrock Ltd. v. Lasater, 781 F.2d 129, 132-33 (8th Cir. 1986)); accord, **Insty*Bit, Inc.**, 95 F.3d at 673; **Aromatique, Inc.**, 28 F.3d at 873.  On the other hand, it is functional "'if it is essential to the use or purpose of the article or it affects the cost or quality of the article.'" **Home Builders Ass'n of Greater St. Louis v. L&L**, 226 F.3d 944, 948 (8th Cir. 2000) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10 (1982)).  Clearly, the "Budweiser" trade dress is nonfunctional.

The third prong is the likelihood of confusion as to the source of the allegedly infringing product. Factors to be considered in evaluating this likelihood are: "1) the strength of [Plaintiff's] mark; 2) the similarity between [Plaintiff's] and [VIP's] marks; 3) the degree to which the allegedly infringing product competes with [Plaintiff's] goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers[;] and 6) evidence of actual confusion." **Davis v. Walt Disney Co.**, 430 F.3d 901, 903 (8th Cir. 2005) (citing Squirt Co. v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1990)). To establish confusion, it is not necessary for consumers to purchase the allegedly infringing item believing that the item was manufactured by the plaintiff. **Insty*Bit, Inc.**, 95 F.3d at 671.

VIP has conceded that only the last two factors are at issue: the degree of care and the evidence of actual confusion.

(1) Degree of Care Expected of Potential Customers. The uncontroverted evidence is that each survey participant was allotted as much time as they wished to view the test product or the control product. They were not rushed. VIP argues, but presents no case law or opposing evidence, that because "Buttwiper" is more expensive than a typical dog squeeze toy, the survey is invalid. There is evidence that some of Plaintiff's dog-related items are of a similar cost. Moreover, Mr. Mantis's uncontroverted expert opinion was that due to the low cost of this type of item ($10 each for 2 squeeze toys) the findings of the survey are reasonable and credible. If the item was a $25,000 automobile, there may be an issue; with today's economy, a $10 dog toy is not considered a high-end product.

(2) Actual Confusion. Plaintiff's evidence of actual confusion comes primarily from the Mantis survey, which reported a 30% confusion rate among potential purchasers of dog

toys. Consumer surveys are "useful evidence of the likelihood of confusion," but "are not required for such a determination." **Insty\*Bit, Inc.**, 95 F.3d at 671 (citing <u>Woodsmith Publ'g Co. v. Meredith Corp.</u>, 904 F.2d 1244, 1249 (8th Cir. 1990) (reviewing case law from the First and Seventh Circuits holding that surveys are "valuable" in demonstrating actual confusion and are the most "accurate evidence" of actual confusion)). <u>See</u> <u>also</u> **Gateway Inc.**, 384 F.3d at 510 (finding that adequate evidence of actual confusion was established by nationwide survey resulting in 39% of those surveyed believing that the plaintiff had manufactured or sponsored the defendant's product, and noting that this confusion rate "substantially exceed[ed]" the 11% rate previously held to be sufficient to establish actual confusion); **Mutual of Omaha Ins. Co. v. Novak**, 836 F.2d 397, 400 (8th Cir. 1987) (finding it appropriate that survey was used to determine actual consumer confusion between insurance company's trademark and similar design placed on T-shirts and concluding that district court had not erred in giving that survey significant weight; 400 people over age of 21 in four cities were shown defendant's design on T-shirt, a design "reminiscent" of plaintiff's marks and also used by defendant on other articles of clothing, buttons, and coffee mugs; 25% of those interviewed believed that the insurance company "[went] along" with the defendant's design).

In the instant case, the survey was conducted in a technically proper manner using relevant and non-confusing questions.[10] <u>See</u> **ConAgra, Inc. v. George A. Hormel, Co.**, 990 F.2d 368, 370 (8th Cir. 1993) (holding that evidentiary value of surveys for showing of actual confusion in trademark cases depends on the relevance of the questions asked and the technical adequacy of the survey). The 327 participants in the survey included only those

---

[10]<u>See</u> Pl. Ex. 24 (copy of survey).

individuals who, within the next six months, were likely to purchase a dog toy. They were able to view "Buttwiper" and a control item for as long as they wished. After they were finished looking at the items, the items were removed and the survey questions were asked. Examples of core questions are as follows: "What company or companies do you think makes or puts out the product you just saw?" (question 1); "Do you think that the company that makes or puts out the product you just saw puts out any other products or brands?" (question 5); "What other products or brands do you think are put out by that company?" (question 6); "Whether or not you know the name of the company that makes or puts out the product you just saw, do you think that company puts out any other products or brands?" (question 10); "Do you think that the company that makes or puts out the product that you just saw does or does not have a business connection or business affiliation with any other company or brand?" (question 15); "Do you think that the product that you just saw is or is not made or put out with the approval or sponsorship of any other company or brand?" (question 18). (Pl. Ex. 24.)

From the responses to these and other questions in the survey, Mr. Mantis concluded that 30.3% of those surveyed had the mistaken belief that "Buttwiper" is made or put out by or with the approval or sponsorship of the maker of "Budweiser" – Plaintiff – or that there is a business relationship between the maker of "Budweiser" and the maker of "Buttwiper." Mr. Mantis concluded that the confusion was because of the name and/or the appearance of "Buttwiper." VIP's cross-examination of Mr. Mantis focused on several specific answers to questions in the survey. For example, an individual in the test group answered "Budweiser I guess" "[b]ecause of the beer bottle and colors" when asked what company or brand put out or approved of the making of "Buttwiper"; another answered "Budweiser I guess" when asked

what company made "Buttwiper," explaining it looked like a "Budweiser" bottle. (Pl. Ex. 24 at 7-12; Pl. Ex. 30 at 26.) Mr. Mantis was asked on cross-examination how he explained the "I guess" when he had earlier testified that interviewees were instructed not to guess. (Tr. at 53.) Mr. Mantis replied that it was not uncommon for people "to articulate their thoughts in this particular fashion." (Id. at 54.) His cross-examination also covered the survey universe, the cost of the items that were to be purchased, the length of time the survey participant was able to view the items, the socioeconomic background of those interviewed, the exclusion of those individuals under 21 years of age from the survey, and the control product. Mr. Mantis's response to the "I guess" questions and his responses to the other areas of inquiry satisfy the Court that Mr. Mantis properly and carefully evaluated each and every survey answer in reaching his conclusion. His testimony is more than sufficient to allow the Court to accept the survey findings.

VIP contends that the survey is deficient because "Buttwiper" is on the high-end of the cost of dog squeeze toys, yet the survey did not include cost as a factor. The Court disagrees. The "universe" of the survey included those who, within the next six months, were likely to purchase such a dog toy. Interviewees were able to view the dog toy for as long as they wished. Although the interviewees were not advised of the cost of the item (approximately $20 for the two-pack), VIP produced no evidence that the actual cost of $10 per dog toy is so significant as to cause the survey results to be faulty.

VIP also challenges the age group of the survey universe, specifically the exclusion of individuals between the ages of 18 and 21 years. Mr. Mantis testified that this exclusion had no effect on the survey because of the small segment of the population, approximately 6%,

13

that fit in that particular category. VIP presented no evidence to the contrary. Furthermore, VIP presented no evidence through its own survey and relied instead on its cross-examination of Mr. Mantis to establish its position.

For the foregoing reasons, the Court finds that there is credible evidence of a 30% confusion rate between "Budweiser" and "Buttwiper."

In addition to the confusion demonstrated by the survey, Plaintiff submitted an example of actual confusion when its employees conducted a computer word search on the Sears & Roebuck website. The employees used "Budweiser Beer" as the search phrase when looking for a "Budweiser" cooler. In addition to the cooler, the search results included VIP's "Buttwiper" product. Although the Court is not a computer expert, it is evident that the individual who programmed the website or input the items connected "Buttwiper" to "Budweiser."

The issue of confusion falls considerably on Plaintiff's side of the ledger. For the foregoing reasons, the Court finds that Plaintiff has proven actual confusion between Plaintiff's "Budweiser" and VIP's "Buttwiper."

(3) Parody. "Parody[11] is another factor to consider in determining the likelihood of confusion, and casts several of the above-cited six factors[, see page 10, supra,] in a different light." **Utah Lighthouse Ministry v. Found. for Apologetic Info. in Research**, 527 F.3d 1045, 1055 (10th Cir. 2008). See also **Elvis Presley Enters. v. Capece**, 141 F.3d 188, 198

---

[11]"A parody is a humorous or satirical imitation of a work of art that 'creates a new artwork that makes ridiculous the style and expression of the original.'" **Eli Lilly & Co. v. Nat'l Answers, Inc.**, 233 F.3d 456, 463 (7th Cir. 2000) (quoting Rogers v. Koons, 960 F.2d 301, 309-10 (2nd Cir. 1992)).

(5th Cir. 1998) ("[P]arody is not a defense to a trademark infringement action, but rather another factor to be considered, which weighs against a finding of a likelihood of confusion."). "A parody creating a likelihood of confusion may be subject to a trademark infringement action." **Anheuser-Busch, Inc. v. Balducci Publ'ns**, 28 F.3d 769, 776 (8th Cir. 1994). "'Some parodies will constitute an infringement, some will not. But the cry of "parody!" does not magically fend off otherwise legitimate claims of trademark infringement or dilution. There are confusing parodies and non-confusing parodies. All they have in common is an attempt at humor through the use of someone else's trademark. A non-infringing parody is merely amusing, not confusing." **Dr. Seuss Enters., L.P. v. Penguin Books, USA**, 109 F.3d 1394, 1405 (9th Cir. 1997) (quoting McCarthy on Trademarks, § 31.38[1] at 31-216 (rev. ed. 1995)).

Here, Mr. Sacra directed a graphic designer to create a knock-off of the "Budweiser" trade dress for use on his product. Although "intent to parody is not an intent to confuse the public," **Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC**, 507 F.3d 252, 263 (4th Cir. 2007), "[e]vidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion," **Utah Lighthouse Ministry**, 527 F.3d at 1055.

In support of its parody defense, VIP relies heavily on two cases: **Louis Vuitton Malletier**, supra, and **Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC**, 221 F. Supp.2d 410 (S.D. N.Y. 2002). A review of these two cases reveals facts and law distinguishable from the instant case. The first case involves a defendant company manufacturing and selling "Chewy Vuitton" dog toys that were successful parodies of the "Louis Vuitton" mark and trade

dress.  **Louis Vuitton**, 507 F.3d at 258.  Unamused, plaintiff, a well-known manufacturer of luxury handbags and luggage, sued the dog toy manufacturer for trademark infringement.  The court found that there was a successful parody, but there was no likelihood of confusion.  **Id.** at 261, 263.  However, unlike in the instant case, there was no evidence that Louis Vuitton sold dog toys with its brand; there was no evidence by Louis Vuitton of any survey or of confusion; and there was an appreciable difference in the cost of any Louis Vuitton product and the dog toy at issue.  **Id.** at 260-61, 263.  In the instant case, Plaintiff presented survey evidence of confusion; evidence that Plaintiff sells a number of pet-related items with its brand; and evidence that the competing items are similar in cost, i.e., a $11 "Budweiser" dog leash, a $11 "Budweiser" collar, a $10 "Buttwiper" dog toy.  (See Pl. Exs. 40-44.)

The **Tommy Hilfiger** case is also distinguishable.  That case involves a defendant company manufacturing and selling dog perfume called "Timmy Holedigger."  Sued by plaintiff for trademark infringement and trademark dilution, among other claims, defendant raised parody as a defense.  Plaintiff owned the "Tommy Hilfiger" and flag design trademarks and used them for its high-end products, including perfumes.  **Tommy Hilfiger**, 221 F. Supp.2d at 412.  The court held that the parties' products did not compete, noting that "courts are most vigilant to guard against a likelihood of confusion when the plaintiff and the defendant use their marks on directly competing products."  **Id.** at 418.  There was no evidence of confusion, nor did the plaintiff produce any survey evidence supporting such.  **Id.** at 419.

On the other hand, there are two cases from the Eighth Circuit Court of Appeals that are more on point.  In both **Anheuser-Busch**, 28 F.3d at 772, 774-75, and **Mutual of Omaha**,

836 F.2d at 400-01, the court relied on surveys that demonstrated a likelihood of confusion. In both cases, a parody argument did not defeat the survey evidence. Similarly, the Court finds that VIP's parody argument does not defeat the likelihood of confusion established by Plaintiff. The Court further finds that, based upon the evidence presented, Plaintiff has at least a "fair chance" of prevailing on the confusion question. See **Waddle**, 335 F.3d at 690.

B. Threat of Irreparable Harm. A showing of the likelihood of confusion "supports a strong presumption of irreparable harm" in trademark cases. **Coca Cola Co. v. Purdy**, 382 F.3d 774, 789 (8th Cir. 2004) (citing Calvin Klein Cosmetics Corp. v. Lennox Labs., Inc., 815 F.2d 500, 505 (8th Cir 1987)). This is because the court can "presume irreparable injury from a finding of probable success in proving likelihood of confusion." **Calvin Klein**, 815 F.2d 505. See also **Phelps-Roper**, 509 F.3d at 488 (holding that the irreparable injury prong for a preliminary injunction was satisfied based on the court's conclusion that the plaintiff had a fair chance of prevailing on the merits of her claim).

C. The Balance of Harm. The Court finds that this balancing test favors Plaintiff. There is uncontested evidence of the likelihood of confusion between Plaintiff's product and VIP's dog toy. The Court has found that Plaintiff has at least a fair chance of prevailing in its trademark and unfair competition claims. VIP has presented no evidence of any harm it may endure if Plaintiff is granted a preliminary injunction. And, Plaintiff has used the "Budweiser" name since 1876. VIP began selling "Buttwiper" in September of 2007.

D. The Public Interest. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." **Opticians Ass'n of America v. Indep. Opticians of America**, 920 F.2d 187, 198

(3rd Cir. 1990) (citing 2 <u>McCarthy on Trademarks</u>, § 30:21).  <u>See also</u> **Coca-Cola Co.**, 382

F.3d at 789 (holding in an internet case that, although public interest was not ordinarily

implicated by concerns related to business reputation, the danger of consumer confusion or

deception gave rise to public interest considerations).  The Court finds that public interest

considerations favor the granting of a preliminary injunction.

For the foregoing reasons, the Court finds that all four factors weigh in favor of

granting Plaintiff's motion for preliminary injunction on its claims for trademark infringement

and unfair competition.[12]

II.  Dilution.  Title 15 U.S.C. § 1125(c) "provides that '[t]he owner of a famous mark

shall be entitled . . . to an injunction against another person's commercial use in commerce of

a mark or trade name, if such use . . . causes dilution of the distinctive quality of the mark.'"

**DaimlerChrysler AG v. Bloom**, 315 F.3d 932, 936 (8th Cir. 2003) (quoting § 1125(c))

(alterations in original); <u>accord</u> **Viacom Inc. v. Ingram Enters., Inc.**, 141 F.3d 886, 888 n.1

(8th Cir. 1998).  <u>See also</u> **Nat'l Ass'n for Healthcare Commc'ns v. Central Ark. Area**

**Agency on Aging, Inc.**, 257 F.3d 732, 738 (8th Cir. 2001) ("An injunction to prevent dilution

is available only for a famous mark, and only against a diluting use that began after the mark

became famous.").

---

[12]"[T]he Missouri common law of unfair competition is in accord with federal law, i.e., the right to exclusive use of a name is entitled to protection when use by another is likely to cause confusion in the minds of the public . . . ." **WSM, Inc. v. Hilton**, 724 F.2d 1320, 1331 n.6 (8th Cir. 1984).  Thus, the Court's holding applies also to Plaintiff's Missouri common law claims.

Examining Plaintiff's dilution claims under the factors to be considered for a preliminary injunction, see page 8, supra, the Court finds that Plaintiff has failed to carry its burden.

A.  Likelihood of Success on the Merits.  It is undisputed that the "Budweiser" mark is famous; that VIP used the mark after it became famous; and that VIP used the mark in commerce.  The only issue remaining is whether "Buttwiper" dilutes by blurring or tarnishment the "Budweiser" trademark.

"Dilution by blurring" is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B).

> In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
>
> > (i)  The degree of similarity between the mark or trade name and the famous mark.
> >
> > (ii)  The degree of inherent or acquired distinctiveness of the famous mark.
> >
> > (iii)  The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
> >
> > (iv)  The degree of recognition of the famous mark.
> >
> > (v)  Whether the user of the mark or trade name intended to create an association with the famous mark.
> >
> > (vi)  Any actual association between the mark or trade name and the famous mark.

Id.

Dilution by blurring "does not require proof of competition or likelihood of confusion." **Everest Capital Ltd. v. Everest Funds Mgmt., LLC**, 393 F.3d 755, 762 (8th Cir. 2005). Proof of actual dilution, however, is required. **Id.** at 763. "'[W]here the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution.'" **Id.** (quoting Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003)) (alternation in original). "[A] mere similarity in the marks – even a close similarity – will not suffice to establish per se evidence of actual dilution." **Savin Corp. v. Savin Group**, 391 F.3d 439, 453 (2nd Cir. 2004).

The Court finds that the "Budweiser" and "Buttwiper" marks are similar but not identical. "'Blurring' is not a necessary consequence of mental association." **Moseley**, 537 U.S. at 434 (finding that a witness's mental association between "Victoria's Secret," a seller of women's lingerie, and "Victor's Secret," a store that sold novelty gifts, did not show that the witness had formed any different impression of "Victoria's Secret" because of the association and, therefore, did not show dilution by blurring).

Plaintiff has presented evidence of confusion between the two products, but there is no evidence in the survey demonstrating that consumers would change their impression of "Budweiser" because of an association with "Buttwiper." The Court finds that Plaintiff has failed to prove it has a "fair chance" of prevailing on the dilution by blurring claim . Its request for an injunction based on this claim is denied.

Plaintiff also claims that the "Buttwiper" product dilutes its mark by tarnishment. "Dilution by tarnishment" is defined as "association arising from the similarity  between a mark

or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).

There is testimony that the dog on the "Buttwiper" toy is suffering from some unsavory condition affecting its anal glands.  There is also an opinion by an employee of Plaintiff that the line following the dog drawing is a feces mark.  There is, however, no evidence that "Buttwiper" has harmed the reputation of "Budweiser."  The dilution by tarnishment claim will not support a preliminary injunction under federal law.

Plaintiff also seeks an injunction under Missouri law.  To prevail on a Missouri dilution claim, Plaintiff "must show:  (1) the alleged trademark is valid at common law; (2) that the alleged mark is particularly strong; and (3) that defendant's use of the challenged [mark] creates a likelihood of dilution of the distinctive quality of plaintiff's mark."  **Steak N Shake Co. v. Burger King, Corp.**, 323 F. Supp.2d 983, 991 (E.D. Mo. 2004).  As with the federal claim, there is no showing of a dilution of Plaintiff's distinctive "Budweiser" mark.

## Conclusion

As set forth above, the Court finds in favor of Plaintiff on its request for a preliminary injunction based on its claims for trademark infringement and unfair competition. Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction is **GRANTED** in part and **DENIED** in part as set forth above. [Doc. 18]

A separate preliminary injunction in accordance with this Memorandum and Order is entered this same date.[13]

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of October, 2008.

---

[13] Plaintiff requested an order that VIP recall all products bearing "Budweiser" marks or any similar marks and deliver for impoundment or destroy all infringing products. The Court will deny these requests.